Filed 11/22/2019

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re EUGENE JONES,<br><br>    on Habeas Corpus. | A157877<br><br>(Contra Costa County<br>Super. Ct. No. 51816487) |

Eugene Jones has filed a petition for writ of habeas corpus challenging the denial of his superior court petition to recall his sentence and resentence him pursuant to Penal Code section 1170, subdivision (d)(2) (section 1170(d)(2)).[1]  Jones is serving a sentence of life in prison without the possibility of parole (LWOP) for a 1994 murder and other offenses he committed when he was 19 years old.  He contends that section 1170(d)(2) violates his constitutional rights to equal protection of the law because it does not apply to youthful offenders like him, who were between the ages of 18 and 25 when they committed their crimes.  We will deny this petition.

Jones was representing himself in July 2018, when he filed a petition in the superior court to recall his sentence pursuant to section 1170(d)(2).  This statute provides that a defendant who is serving an LWOP sentence for an offense committed when the defendant was "under 18 years of age" and who has been incarcerated for at least 15 years "may submit to the sentencing court a petition for recall and resentencing." (§ 1170(d)(2)(A)(i).)  If specified conditions are met, the court must hold a hearing and consider resentencing the defendant.  (§ 1170(d)(2)(E).)  In his superior court petition,

---

[1]  We grant Jones's request to take judicial notice of the record on appeal that was filed in *People v. Jones*, A155475.

Jones acknowledged he was 19 when he committed the offenses that resulted in his current sentence, but he argued that "he should be permitted to petition to recall his LWOP sentence . . . as a matter of equal protection."

In September 2018, the superior court filed an order denying Jones's petition. Construing Jones's pleading as a petition for a writ of habeas corpus, the court rejected on the merits Jones's claim that the age restriction in section 1170(d)(2) violates his right to equal protection. In this court, Jones, who is represented by counsel, refines his constitutional claim. He contends that section 1170(d)(2) violates equal protection because it denies young adult LWOP offenders ages 18 to 25 the same opportunity to petition for resentencing that is afforded to similarly situated juvenile offenders without any rational basis for doing so.

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195 (*Edwards*).) "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." ' [Citation.] 'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Brown* (2012) 54 Cal.4th 314, 328, italics omitted.)

Because LWOP offenders who were between the ages of 18 and 25 when they committed their offenses are adult offenders they are not similarly situated to juvenile offenders described in section 1170(d)(2). The United States Supreme Court has repeatedly found that "children are constitutionally different from adults for purposes of sentencing." (*Miller v. Alabama* (2012) 567 U.S. 460, 471 [mandatory LWOP sentence for juvenile offender violates the Eighth Amendment]; see also *Graham v. Florida* (2010) 560 U.S. 48, 68 [Eighth Amendment prohibits imposing LWOP sentence on juvenile offender for nonhomicide offense]; *Roper v. Simmons* (2005) 543 U.S. 551, 569 [Eighth

2

Amendment prohibits imposing death penalty on juvenile offender under the age of 18].) Juveniles as a group are not similarly situated to adults who commit otherwise comparable crimes because of their lack of maturity, vulnerability to negative influences, and incomplete character development. (*Ropers, supra*, 543 U.S. at pp. 569–570.) "Because juveniles have diminished culpability and greater prospects for reform . . . 'they are less deserving of the most severe punishments.' " (*Miller, supra*, 567 U.S. at p. 471.)

Disputing this conclusion, Jones posits that the criteria for distinguishing juveniles from adults supports his equal protection claim. According to Jones, the "underlying rationale" of section 1170(d)(2) is that "young people are different developmentally and neurologically" from older offenders. He further alleges that young adults who are between 18 and 25 when they commit their LWOP offenses are similarly situated to juvenile LWOP offenders because they also have developing brains, lack maturity, and have increased potential for rehabilitation.

Jones cites no authority for the purpose he ascribes to section 1170(d)(2), and we think his formulation fails fully to capture it. The Legislature may well have been concerned that "young people are different developmentally and neurologically," but it was also concerned, more specifically, with LWOP sentences meted out on children—on those young people who were under the age of 18 when they committed their crimes. "[T]he most reliable indicator of legislative intent" is generally the language of a statute (*Murphy v. Kenneth Cole Productions, Inc*. (2007) 40 Cal.4th 1094, 1103), and here the express terms of section 1170(d)(2) indicate that the statute was aimed at providing relief only for those who had not yet reached the age of majority when they committed their crimes. By drawing the line at a defendant's eighteenth birthday, the Legislature has chosen to target the youngest, and presumably most deserving, of the group of youthful offenders whose brains were still developing and whose judgment had not yet matured. While young adults share many of the attributes of youth, they are by definition further along in the process of maturation, and the law need not be blind to the difference.

Jones intimates that section 1170(d)(2) serves the same purpose as Penal Code section 3051, which establishes special parole eligibility guidelines for young adult

3

offenders. He then opines that when section 3051 was amended to raise the age of youthful offender parole eligibility to 25, the Legislature implicitly found that the brain is not fully developed until at least that age. Jones overlooks, however, that section 3051 does not apply to individuals who received an LWOP sentence for a crime that was committed after they turned 18. (§ 3051, subd. (h).) Thus, to the extent it is relevant here, section 3051 is inconsistent with Jones's claim that criminal offenders who received LWOP sentences for crimes they committed before they turned 18 are similarly situated to young adult offenders serving LWOP sentences.

Even if we assume that adult LWOP offenders under the age of 25 are similar to juvenile LWOP offenders in the sense that their brains are not fully developed, section 1170(d)(2) does not violate equal protection because the "Legislature has a constitutionally sufficient reason to treat the groups differently." (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326.) "Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference. [Citation.] '[E]qual protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' [Citation.] . . . If a plausible basis exists for the disparity, '[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law.' " (*Edwards, supra,* 34 Cal.App.5th at pp. 195–196.)

To determine the age at which the diminished culpability of a youthful offender should no longer result in a categorically different sentence, a line must be drawn somewhere. (*Roper, supra,* 543 U.S. at pp. 574, *Graham, supra*, 560 U.S. at pp. 75–79.) "[W]hile '[d]rawing the line at 18 years of age is subject … to the objections always raised against categorical rules …[, it] is the point where society draws the line for many purposes between childhood and adulthood.' " (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 quoting *Roper, supra*, 543 U.S. at p. 574.) The Legislature could reasonably decide that for those convicted of LWOP crimes, the line should be drawn at age 18, rather than at some later date when the brain is fully developed. Drawing a bright line at

4

age 18 establishes an objective and easily implemented measure, which has been used by the United States Supreme Court for sentencing purposes. While a different line could have been drawn, it is not entirely arbitrary to limit section 1170(d)(2) to individuals who committed their crimes before they were 18 years old.

The petition for writ of habeas corpus is denied.

_____
TUCHER, J.

WE CONCUR:


_____
POLLAK, P. J.


_____
STREETER, J.


*In re Eugene Jones* (A157877)

POLLAK, J., Concurring.

I concur that this petition must be denied because controlling Supreme Court authority establishes that the distinction drawn in Penal Code[1] section 1170, subdivision (d)(2) between offenders under and over the age of 18 who commit life-without-possibility-of-parole (LWOP) offenses cannot be considered irrational. "The age of 18 is the point where society draws the line for many purposes between childhood and adulthood." (*Roper v. Simmons* (2005) 543 U.S. 551, 574.) However, although equal protection principles do not entitle defendant to resentencing under section 1170, subdivision (d)(2), the exclusion of LWOP offenders between the ages of 18 and 25 from the right to a youthful offender parole hearing under section 3051 does not necessarily withstand scrutiny under those principles. Whereas section 1170, subdivision (d)(2) distinguishes between offenders under and over 18 years of age, section 3051 distinguishes both between those who committed their offenses under 18 years of age and those between 18 and 25 years of age, and between offenders 18 to 25 years of age sentenced to prison terms with the possibility of parole and those in the same age group who have been sentenced to life without the possibility of parole.[2] Whether equal protection requires that defendant receive a youth offender parole hearing under section 3051 is not the question now before us, and our decision should not be misunderstood to prejudge that question.

The cases cited in the lead opinion reflect the recognition that young persons "are constitutionally different from adults for purposes of sentencing" and " 'are less deserving of the most severe punishments.' " (*Miller v. Alabama* (2012) 567 U.S. 460,

---

[1] All statutory references are to the Penal Code.

[2] I do not address other distinctions made in section 3051. The distinctions to which I refer emerge between subdivision (a)(1) of section 3051, providing a youth offender parole hearing for "any prisoner who was 25 years of age or younger . . . at the time of his or her controlling offense," and subdivision (h), providing, "[t]his section shall not apply to cases in which . . . an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age."

1

471.) The United States Supreme Court has recognized "three significant gaps between juveniles and adults. First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Ibid.*) For these reasons, juvenile offenders have "greater prospects for reform" than adults who have committed the same serious offenses invoking life or life-equivalent prison sentences. (*Ibid.*; see also *Graham v. Florida* (2010) 560 U.S. 48, 74 [recognizing that life without parole "forswears altogether the rehabilitative ideal" and reflects "an irrevocable judgment about [an offender's] value and place in society" that is at odds with a child's capacity for change].)

Section 3051 was enacted in response to this authority and in recognition that "[e]xisting sentencing laws do not distinguish youth from adults." (Assem. Com on Public Safety, Analysis of Sen. Bill No. 260 (2013-2014 Reg. Sess.) July 2, 2013.) The purpose of the act was "to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity." (Stats. 2013, ch. 312, § 1.)

Despite the fact that the line between youth and adulthood has traditionally been drawn at 18 years of age, recent amendments to section 3051 recognize that the maturity process does not end at 18 and in many cases extends to at least 25 years of age. In 2015, relying on the evolving understanding of brain development, the Legislature amended section 3051 to provide relief for most offenders who committed their offenses before reaching the age of 23. (Stats. 2015, ch. 471, § 1.) According to the author of the amendment, "Recent scientific evidence on adolescent and young adult development and neuroscience shows that certain areas of the brain—particularly those affecting judgment

2

and decision-making—do not fully develop until the early- to mid-20s. Various studies by researchers from Stanford University (2009), University of Alberta (2011), and the National Institute of Mental Health (2011) all confirm that the process of brain development continues well beyond age 18." (Sen. Com on Public Safety, Analysis of Sen Bill No. 261 (2015-2016 Reg. Sess.) Apr. 28, 2015, p. D.)

Effective January 2018, section 3051 was amended again to require youth offender parole hearings for offenders who committed their crimes when they were 25 years of age or younger. (Stats. 2017, ch. 675, § 1.) According to the author of the amendment, " 'AB 1308 would align public policy with scientific research. . . . Scientific evidence on adolescence and young adult development and neuroscience shows that certain areas of the brain, particularly those affecting judgement and decision-making, do not develop until the early-to-mid-20s. Research has shown that the prefrontal cortex doesn't have nearly the functional capacity at age 18 as it does at 25. The prefrontal cortex is responsible for a variety of important functions of the brain including: attention, complex planning, decision making, impulse control, logical thinking, organized thinking, personality development, risk management, and short-term memory. These functions are highly relevant to criminal behavior and culpability. [¶] 'Since the passage of SB 260 and SB 261 motivation to focus on rehabilitation has increased. An offender is more likely to enroll in school, drop out of a gang, or participate in positive programs if they can sit before a parole board sooner, if at all, and have a chance of being released.' " (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308, as amended March 30, 2017 (2017-2018 Reg. Sess.) Apr. 25, 2017, pp. 2-3.) Thus, section 3051 is designed to permit the re-evaluation of the fitness to return to society of persons who committed serious offenses prior to reaching full cognitive and emotional maturity. Yet, subdivision (h) denies this reevaluation to those between 18 and 25 years of age when they committed their offense but were sentenced to life without possibility of parole.

Whether a statutory classification denies equal protection to persons excluded from the classification but who are similarly situated to those receiving the benefits of the statute turns on whether there is a rational basis for the exclusion. Those who are

similarly situated to the beneficiaries of the statute is determined not by whether they " 'are similarly suited for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Brown* (2012) 54 Cal.4th 314, 328.) As explained above, the purpose of section 3051 is not to measure the extent of punishment warranted by the offense the individual committed but to permit the evaluation of whether, after years of growth in prison, that person has attained the maturity to lead a law-abiding life outside of prison. Both a person sentenced to LWOP for a crime committed while under 18 and a person receiving the same sentence for a crime committed when 18 or slightly older committed their offenses before their character was necessarily "well formed" and when their judgment and decision-making were likely to improve. Both are similarly situated for the purpose of evaluating whether they have outgrown the youthful impulses that led to the commission of their offenses. Likewise, a person who committed an offense between 18 and 25 years of age serving a sentence permitting parole and a person who committed an offense at the same age serving an LWOP sentence are similarly situated for the purpose of determining whether they have outgrown the youthful impulses that led to the commission of their offenses. The presumptive fact that the LWOP sentence was based on a more serious offense provides no rational basis for the distinction because the statute is not designed to determine the degree of appropriate punishment but to determine whether the individual has outgrown his or her criminality. There is no reason to conclusively presume that one such person is more likely to have satisfactorily matured than the other.

Accepting the premise that there is a rational basis for treating all those 18 years and older differently from juveniles for the purpose of sentencing, or for resentencing under section 1170, subdivision (d)(2), it does not necessarily follow that there is a rational basis for excluding a 19-year old, such as Jones, from the benefit of section 3051. His sentence was designed to reflect, among other things, the severity of his crime. A youth offender parole hearing under section 3051 would be designed to evaluate whether, despite the magnitude of his offense, he has attained the level of insight and maturity that warrants a return to society. Providing youthful offender parole hearings to individuals

4

like Jones, who were barely beyond the point of legal majority when they committed their offense, would not mean that he or she is necessarily suitable for release, but only that he or she may be evaluated to make that determination. The Legislature having recognized that the maturing process normally continues to at least 25 years of age, there is little if any reason to deny these individuals the opportunity to show that they have attained the level of maturity that warrants their return to society.

Whether section 3051 as it now reads denies Jones constitutionally protected equal protection is not the issue before us at this juncture. However, I suggest that—before the issue ripens—there is good reason for legislative reconsideration of the exclusion of young adults serving LWOP sentences from the scope of the statute.


_____
POLLAK, P. J.

I CONCUR:


_____
STREETER, J.

A157877

5

Trial Court:                                        Contra Costa County Superior Court

Trial Judge:                                      Hon. Anita Santos

Counsel for Petitioner:                       L. Richard Braucher, by Court-Appointment under the First District Appellate Project

Counsel for Respondent:                     Xavier Becerra, Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Rene A. Chacon, Supervising Deputy Attorney General; Lauren Apter, Deputy Attorney General